Please have a seat. What I thought we'd do is we would call both Wilson and Ray and proceed in the following order, that we hear first from the appellant in Wilson, second from the appellant in Ray, and then hear from the state in response to both, if that's agreeable with everyone. I thought it would be more efficient that way. Any objection to that? No. Then why don't we do this, why don't the lawyers then introduce themselves for the record. We'll call the cases first. Case number 10-1038, People v. Lorenzo Wilson. And we'll call the Ray case also. Okay, case number 10-2170, People v. Erica Ray. May it please the court, my name is Katherine Donahoe, I'm here from the Office of the State Appellate Defender on behalf of Lorenzo Wilson. Good morning, your honors. My name is Rachel Moran and I'm here on behalf of Erica Ray. Private counsel? We're the state appellate defender. Is it too late to ask you to see if you can coordinate so that you don't necessarily each have to go over the same ground? Not too late at all, your honors. All right, well, we're not forcing this on you, but it would be more convenient since there are a number of overlapping issues. Definitely. All right. Good morning, Janet Mahoney on behalf of the people of the state of Illinois. All right, thank you. So I think we'll start with Ms. Donahoe. Good morning, your honors. So I'll be arguing on behalf of Appellant Lorenzo Wilson. And in Mr. Wilson's brief, he raised four issues and I'd like to focus on the first issue, but I'm happy to answer questions regarding any of the other issues. And I'd like to save a couple of minutes for rebuttal. So after a jury trial, Lorenzo Wilson was convicted of first degree murder and armed robbery. And about half of Lorenzo's jury trial consisted of the state eliciting the prior inconsistent statements of Lorenzo's uncle, Charles Wilson. However, the state should not have been permitted to use Charles' handwritten or audio tape statements because they did not satisfy the personal knowledge requirements, section 115-10.1, and they were not admissible to impeach Charles' testimony. Charles only testified after the court adjudged him a material witness and ordered him to testify. When the state attempted to question him about his interactions with Lorenzo in the days following the shooting at Leona's, Charles alternately stated that he did not recall doing any of these things, that he was on drugs at the time, and that he did not know the answers to the state's questions. Aren't we talking about really the issue of, first of all, the personal knowledge requirement of that portion of the statute, number one? And number two, if it was error, whether it was harmless error under the circumstances? Exactly, Your Honor. So why don't we just go to those issues, at least initially? The first one presumes impeachment rather than substantive. Then having all three statements admitted as substantive evidence, you're now saying, well, let's have one under the statute for substantive evidence, and the other two, arguably, against your contentions, admitted as impeachment evidence. And so you're basically, you would be taking the position that the admissibility as impeachment won't lie because of the fact that there was no injury to the state in the presentation of its, in Charles Wilson's testimony. So it's no harm, no foul. They're not entitled to impeach to enhance their position. They're only entitled to impeach to preserve it, and there's no need to preserve it here. I don't know. I may have made your argument for you, but I'm not trying to bottom line it so the state can remain calm. That's an excellent summary, Your Honor. And our position is certainly that, according to the record, all three statements were used substantively, but our argument is that not only should the audiotapes and handwritten statement not have been introduced substantively, but they also would not have been. Okay. And you're asking us, then, to abandon Johnson, which was decided in our district, which held that the statute does not prohibit that the same dynamic which would apply to testimonial evidence in terms of prior consistent statements not being admissible will not apply where you have all three, all of the testimony consisting of these untestified two statements that come in under the statute. And we did make that argument in the second issue, and the first issue, our main objection to the audiotapes and handwritten statements, is that they did not comply with the personal knowledge requirement of Section 115-10.1. Okay. Now, why do you say that? And I ask that as an author of McCarter, but, you know, sometimes it really dawns on me that sitting up here may not make us infallible. Well, in this case, I don't think that you got anything wrong in McCarter. No, we got Johnson. And then there's a new McCarter that kind of adapted the old McCarter, but the issue wasn't apparently raised. The co-defendant, Brandon McCarter, that case was decided last year and quoted a large excerpt from the Jamie McCarter decision and endorsed that same reasoning. With respect to personal knowledge, basically the law does not allow the state to introduce second-hand accounts of events because those are still inadmissible hearsay, and they can't be used. But under the common law, wasn't there always an exception for third-party admissions, admissions made to third parties that, you know, I did this? And in Section 115-10.1, it's been around. Arguably, why shouldn't we call a confession its own event? Because the Illinois courts have traditionally recognized that this type of evidence is double hearsay where Charles Wilson had showed up in court and said, this is what Lorenzo told me. He described this, this, this, and this. It's double hearsay maybe with respect to Ray, and we'll deal with that later on because Ray wasn't included in the statement anyway, and that's something which we'll discuss. But otherwise, it's single hearsay. Since a confession, at least when I was first introduced to the point, maybe in law school, I was under the impression that it might not be hearsay at all since the right to confrontation is ultimately the source of hearsay, and the person should not be asking for a right to confront themselves. So it may be like verbal acts or something like that, which wouldn't be considered hearsay. Well, our argument with respect to Lorenzo's statement about what took place at the restaurant is that Charles wasn't there, and while Charles was there to hear Lorenzo's confession, Lorenzo's statement regarding what happened, what took place at the time of the shooting leading up to the shooting, was brought in through Charles's statement, which was brought in through the grand jury testimony through the- Why shouldn't Lorenzo's statement be admissible, at least against Lorenzo, through the testimony of Charles, who heard it and was, and therefore, why shouldn't Charles's testimony about what he heard from Lorenzo, which is incriminating in and of itself without having a photograph in his head of what Lorenzo was talking about, as long as he had a recording of it in his mind, based on what he heard? Well, the section 115-10.1 distinguishes between these types of statements, and it recognizes that we can't record something in our mind, it's not that accurate, and also, basically, the Illinois Courts have recognized in a number of cases that this type of evidence, this secondhand account of a confession and what happened, is one of the most unreliable types of evidence. Well, wait, wait, wait, right there. You mean if Charles Wilson didn't recant, if he was there and he said, this is what Lorenzo said to me, you're saying that that is considered generally unreliable? No, no, I'm sorry, Your Honor. If Charles Wilson had testified and answered the state's questions affirmatively, stating Lorenzo told me A, B, C, that would have been permissible because it was a statement against Lorenzo's own interest. But in this case, where Charles wasn't willing to take the stand and acknowledge any of that, the jury didn't have an opportunity to really understand what was going on at the time that Charles heard these statements from Lorenzo. But isn't that what that first exception of 115 is supposed to do or allow? Wilson was there. He was subject to cross-examination. He gave this previous statement under oath to a number of grand jurors. So I'm not sure I see this distinction where Charles Wilson is present and he can explain what it was that he did say, that he didn't remember this, he was under the influence of drugs. What did he say about the grand jury? Well, the distinction, Your Honor, is in the statute, that the personal knowledge requirement is required. No, I'm talking about one, not two, not the second, not the second. I'm talking about the grand jury. Basically, if all the requirements of Section 115-10.1 recognize that this type of evidence can be unreliable and that we need circumstantial guarantees of its trustworthiness. The only difference between an audio tape or a handwritten and the grand jury is that the statute says there's no personal knowledge requirement if the declarant raises his right hand beforehand, takes an oath, and then says it to the grand jurors. Now, whatever the logic behind that distinction is, it exists. And the question then remains whether personal knowledge is satisfied by being a witness to the confession or whether personal knowledge requires that the subject matter of the confession is something that was eyewitnessed by the person who receives the confession. Isn't that where we are? Yes, and one point that has been made in other decisions is that if Charles Wilson had been present at Leona, then he would have known whether or not the things that Lorenzo said to him were true. He wouldn't have made the confession, though, would he? He might not have. Because he would have seen. And he could have testified to that, and we wouldn't even have to be talking about this. But that's why secondhand accounts like this are discouraged, because if Charles Wilson had firsthand personal knowledge of what took place, he would be less likely to make false statements about what Lorenzo had told him. But he would be like the other witnesses who testified who actually saw it. You're basically indicating earlier, and I don't want to pick you up on this for whatever it may be worth, that somehow the rules of evidence treat the eyes more reliably than they do the ears with respect to speech. And that is ultimately in the theory of hearsay a consideration that somehow reportage of someone else's speech is somehow less reliable than reportage of someone else's visual perception. Exactly, Your Honor. These statements are being attributed to Lorenzo, not just to Charles Wilson. And we can't just blindly accept that Charles Wilson is a perfect filter for the things that Lorenzo Wilson said implicating himself. And we can't accept that we have all the information about the circumstances under which those statements were made and how Charles may have interpreted them. But do you agree that the grand jury testimony under the statute is treated differently and that that was admissible? It is treated to be the way the statute is structured, it clearly gives greater credence to grand jury testimony as being trustworthy hearsay that should be admissible. And audio tape, handwritten statements, these types of things need these additional indices of reliability, including that the person making those statements had firsthand knowledge of what he's talking about. Maybe just for the use of time, since we understand that issue, you might want to address if we believe that it was error, what should be the remedy. Well, in this case, the state spent about half of its time elucidating the prior statements from Charles Wilson, and it's our position that a new trial is warranted because Lorenzo's case was prejudiced by it. Well, some things just take longer to put into evidence because it's being fought.  No, Your Honor, but just the sheer weight of the repetition of this evidence of a confession, and it's important to remember that confessions have generally been considered the most persuasive type of evidence against a defendant. Incidentally, let me bring you back to this. Part of the testimony of Wilson had to do with the actual activity on the part of Lorenzo, the unfolding of the rag, the taking out of the gun, the disposal of the parts. Should that stay in under your theory? We're not challenging the admission of the prior statements with respect to the drive to Mississippi, the drive to Florida, the disposal of the weapon, because those are things that... Right, so Charles Wilson, he actually witnessed these events unfold. He had personal knowledge, which is what the statute requires. But the most damaging testimony that came in was the prior inconsistent statements about Lorenzo's confession. And again, this court in Wilson in 1998 recognized that this type of evidence raises the greatest danger of misapplication by the jury and the greatest risk of total fabrication by the witness. But where it's otherwise admissible through the grand jury testimony, why don't you address the impact of the fact that it also came in through... Again, under Issue 1, we're not challenging the admissibility of the grand jury testimony, but it's well settled that a jury is more likely to believe something that's repeated. And in this case, Charles Wilson made a fool of himself when he testified. And it's highly likely that if the jury had only witnessed his display on the stand and then heard one account of the grand jury testimony, that they might have totally disregarded his testimony. But then what do we do with the other evidence? Well, the other evidence directly implicating Lorenzo was the testimony of Paris Gosha and Anthony Macon. And this was self-serving testimony from two people who received exceptional benefits from the state despite their own involvement in this offense. Gosha's murder charges were dismissed. He received a 30-year sentence for armed robbery, and he'll be expected to serve 15 years. Anthony Macon was never even charged. And this is despite the fact that it took Gosha almost a year and Macon at least six months to even implicate Lorenzo in any of this. They both admitted that they lied to the police. Didn't that happen as a result of the subsequent arrest of Lorenzo Wilson? The police spoke to them before Lorenzo was arrested, and they even denied knowing him. They denied knowing each other. They denied that they'd been seeing each other. They denied that they knew anything about the shooting. And then finally, to get a benefit from the state, they decided to cooperate and implicate Lorenzo. Well, you would certainly have Lorenzo in there in flight in addition to the testimony of the other two defendants. And from what you just said, the flight would be admissible through Charles because that was an event of which he had personal knowledge. You'd have the two witnesses plus Charles' testimony regarding the flight, the possession of a weapon similar to the weapon used to commit the murder, disposal of it in pieces along the highway. Well, we'd argue, even though we're not contesting the event of the murder. Then you do have another witness at the restaurant who basically corroborates what was going on from those statements that the two... Yes, that's correct. There's no dispute as to how the shooting actually unfolded, involving multiple people, something that's robbery. Over a incident in the restaurant. And with respect to Charles Wilson's testimony, even the parts of his testimony that were admissible regarding the flight and the gun, it's important to remember that even though it's admissible, that doesn't mean that it was very credible. Charles Wilson, he didn't even bring up... Do we need a very here to sustain the result? Supposing it's credible but not very credible, are we going to step in under those circumstances? Well, Charles Wilson, he had a number of deep flaws as a witness in any event. In addition to the spectacle he created in the courtroom, the other evidence that came in through the police and the state's attorney showed that he asked if there was a reward for information about this. He only even mentioned... Wasn't he related, though, to the... He was his great uncle. Wasn't he kind of put in a kind of an awkward situation having to testify against his relative and the statements that were made in front of the father that were all not... I don't know if they were objected to, but all this information about having to leave and let's get him out of here and let's get him out in the dark of night. Wasn't he put in kind of a situation that's really awkward where he's ending up having to testify against his relative? I'm not sure. Doesn't the jury have a... I mean, couldn't they kind of take that into account in deciding whether, as you say, he wasn't credible, but in light of what the situation was? It was certainly an awkward situation, but the details of all of that came out through these prior statements, which he was only led to give after he was arrested on his own unrelated gun charges and decided to volunteer that he had information about a homicide in Chicago and asking about whether or not there was a reward. So all of this information came from Charles Wilson, whether it showed up at the trial or whether it showed up when he talked to police in Mississippi or at the grand jury testimony. All of this information came from... The only inside information we have about what was happening with Lorenzo and with his family came from Charles Wilson at some point, and he's been discredited at various points for various reasons along the way. And I'd just also like to point out that the state highlighted his repeated statements in its closing, pointing out that he had said this on three different occasions and that that made it believable. And so we do believe that the fact that this is a confession from Lorenzo, which has great sway with the jury, from a witness who got up on the stand and just wasn't believable at all. Again, if the jury had only heard the grand jury testimony, they might have disregarded it, but they heard testimony from two different prosecutors, two different police officers about all these prior statements and how they were told all along the way and how he was more believable because he kept giving the same story over and over again before trial. And based on that, we need to ask this court to reverse and remand for a new trial because the state's other evidence was deeply flawed as well. Thank you, Mr. Donahoe. Ms. Moran. Having hopefully demonstrated that we're familiar with the facts of the case, you can argue any way you'd like, but I think as Justice Gordon was alluding to, one of the issues that's most interesting to us is the issue of the impact of somebody who was not the utterer of the statements that were repeated. Thank you, Your Honors. Good morning, and may it please the Court. I am Rachel Moran, and I represent Erica Ray. Ms. Ray raised five issues in her brief, including the one Ms. Donahoe just addressed. However, I intend to focus on issue one of her brief. Your Honors, Illinois courts have consistently recognized that a co-defendant's confession to the crime is one of the most prejudicial types of evidence that can be admitted against a defendant. In this case, Lorenzo Wilson's confession that he shot and killed the victim was not only admitted as substantive evidence against Erica Ray in violation of every rule of evidence and constitutional procedure, it was then repeated five times throughout the state's case. Well, it seems that you have two courses that you have to travel here. The first course is through Bruton, and the second course is through the Illinois Supreme Court in Duncan, which takes off and independently navigates without the assistance of Bruton towards the position of a constitutional intervention in allowing a co-defendant to implicate through an inculpatory statement of a co-defendant. The first issue I think you probably want to address is whether Bruton survives Crawford contrary to the state's position and contrary at least through two Circuit Court of Appeals cases, Pike being one of them. And also I think the state wants to recruit Davis on its side and one other United States Supreme Court case, which is a little less articulate about how much of Bruton, if anything, survives. So why don't you pick it up from there?  Bruton does survive Crawford because Bruton had two prongs. Essentially, Bruton was a confrontation clause violation and also very explicitly a due process violation as well. And the state makes no argument, never attempted to. Are you conceding that the confrontation clause does not survive once it's determined that the evidence is non-testimonial? Your Honor, no. Illinois has never addressed that issue, so not entirely. But I would suggest the due process. So you're basically not going to pin your hopes on the Sixth Amendment, but rather on the Fifth Amendment? That's correct, Your Honor. The Fourteenth Amendment, the due process holding is more relevant to this case. Bruton not only explicitly stated that it found a due process violation in allowing a co-defendant's confession to be admitted, but it also cited primarily to Jackson v. Benno, which was not a confrontation clause issue. It was a due process case. Again, finding a due process violation, and that was the primary case that Bruton relied on. It's also relevant that Bruton is clearly broader than Crawford because the confession at issue in Bruton was never actually admitted against the defendant in that case. The jury in Bruton was explicitly instructed that the confession was given a limiting instruction, saying the confession could not be used as evidence against the defendant. And so it was not a typical confrontation clause situation anyway, because it wasn't evidence against the defendant. The court in Bruton found that even though the jury was given a limiting instruction saying this is not substantive evidence, because that kind of error is so prejudicial, because that kind of confession is so prejudicial, it's not even remedied by a limiting instruction. That's a bit of a stretch, isn't it? Assuming that the due process clause is implicated here, if there was an explicit inculcation of your client, we still have a situation where the statement is rejected, and your client is totally eliminated. And now you're attempting somehow to coast in on the sheer sacred pronouncement of the Sixth Amendment principle as it would have been implicated had your client been actually included in that statement. And isn't that a stretch? And don't we at this point also have to ask, if your client's involvement is so, at best, marginal, by its possible infiltration, albeit something that didn't explicitly happen, don't we have to look at harmless error? Well, I'd like to address the first part of your question first. Respectfully, Your Honor, it's neither a stretch nor an attempt to coast. Bruton has explicitly addressed the practice of attempting to remedy an error by redacting the defendant's name, and cited a number of cases finding that unacceptable, that that did not remedy the prejudice. So that's actually something that arose in Bruton and was renounced by the U.S. Supreme Court. Well, there's a little bit of a difference here, because Bruton was concerned about the ability to manage and control the testimony of a lay witness. Here, the management of any is on the prosecutor, because all of this comes in by way of a prosecutor's submission of a prior statement. And that's a lot more effectively managed, unless a prosecutor wants a risk of contempt and ultimately possible troubles with the Bar Association, with the disciplinary court. Your Honor, perhaps people versus Duncan would also be illuminating then. In Duncan, one of the statements did not reference the defendant at all, just like here. The statement in Duncan that did not explicitly reference the defendant at all was a statement that the co-defendant went to Kansas City and purchased drugs from a courier. It never referenced the defendant. It never named him. And the Supreme Court in Duncan found that that was sufficiently implicating the defendant. Because it's alluded to the defendant. How would a jury get to know that Erica Ray even exists? From the statement that was admitted, that we're arguing about the statements, how is that at all inconsistent with the theory evidenced beginning with the opening statement by the defense lawyer that Lorenzo Wilson committed the murder? Your Honor, it's not inconsistent with that, but defense counsel vigorously attempted to preclude this evidence before trial. And we haven't really talked about that, but the court allowed this evidence based on what? Based on the co-conspirator exception, which I'm happy to address, Your Honor. Defense counsel did make a strategic decision, it's true. But initially he vigorously attempted to exclude this evidence and was only forced to make this decision after the court found that it was admissible. And how do we review the court's ruling that under the facts of this case that those statements that were made to Wilson were co-conspirator statements? They are furtherance of the conspiracy. How are we reviewing that as the reviewing court? What standard? Review that de novo, Your Honor. It was a decision of law by the trial court. You don't believe that that's an evidentiary ruling? It was a decision of law to characterize that as a co-conspirator exception. Generally speaking, is that what the cases say? That when the court determines whether something is made in furtherance of the conspiracy, that we review that de novo? Or are they more in line with the notion that this is an evidentiary ruling and is reviewed for an abuse of discretion? The possibility here is also that it's mixed and it's a clearly erroneous standard. Your Honor, as Your Honor just pointed out, there are a variety of standards here. We would submit that the standard is de novo. However, even under an abuse of discretion standard, the court did abuse its discretion in finding this was a co-conspirator statement. Well, if we were to conclude that it was a co-conspirator statement, then what is your argument? Your Honor, the due process violation and the co-conspirator hearsay rule, those are separate pieces. So if this court concludes that it was a statement of a co-conspirator, the Bruton and the Duncan analyses are still very pertinent because it's still a due process violation regardless of whether it's co-conspirator exception. However, if it is not the statement of a co-conspirator, then it's clearly inadmissible hearsay in a particularly prejudicial type of hearsay. Well, explain to me then how you put this together, that if the court, if it's a co-conspirator exception, that still violates the Bruton rule. Yes, Your Honor, because those are separate analyses and there are, the state was unable to cite any case that found that simply because a statement is admitted under the co-conspirator exception, it's allowed to be admitted against a non, the statement of a non-testifying co-defendant is allowed to be admitted against a defendant. Well, that's really what the whole exception to the rule is about, is that it allows a statement of a co-conspirator to be introduced against another conspirator. If it's made in furtherance of that conspiracy. Isn't that the whole purpose? Isn't it treated basically like an admission of the defendant herself? If you've decided that this is a co-conspirator? Your Honor, our position would be that this is only if it is a testifying co-conspirator and that's the purpose of the exception. Well, it would be, but if this were clearly a furtherance of the conspiracy where the state and the defense would both be in agreement that it is a hardcore co-conspirator statement, an attempt to enhance, to conceal, to protect one's fellow conspirators, it would be subject to an agency principle. And as an agency principle, Justice Epstein is totally correct. What we have, let's say if the corporation were the co-defendant in this case, where the guilt of the corporation can only come in through the testimony of an employee or an agent, that it would be barred under the Bruton theory, that the corporation therefore is immune from any kind of criminal sanction because of the due process issue involving the failure of the agent to personally testify. Your Honor, I think that point, quite frankly, is open to debate because it has not been addressed in Illinois. So I'd like to briefly explain why this was not a statement in furtherance of conspiracy and then touch on the harmless error, which is Justice Epstein's concern. This was not, in order to qualify as a co-conspirator, under the co-conspirator exception, it must both be made during dependency of the conspiracy and in furtherance of the conspiracy. And we would dispute both of those prongs, but particularly this is not a statement in furtherance of the conspiracy because in order to qualify a statement in furtherance of conspiracy, it must be made with intent to conceal the offense. And that's what completely fails here. What's the flight all about and what's the disposal of the weapon all about if not to conceal? And what about the statement that I think I justified? To address Justice Gordon's question, he did ultimately attempt to flee. Yes, we would certainly concede that. However, he wasn't attempting to flee or conceal the offense at all when he admitted to Charles Wilson, and that's the statement at issue here. When he admitted to Charles Wilson, he did so in response to Charles' statement, what's wrong? How does he get his uncle or whoever Charles Wilson is to take him to Florida if he doesn't tell him that he committed a crime? Your Honor, the evidence indicates that it was the parents that ultimately decided, after Lorenzo told them, it's time to get out of here, essentially. Well, he's the one that got out, though, not the parents. I mean, he's the one that's fleeing from the crime. Your Honor, he may have later decided to conceal the offense, and it's clear he did. Is this still going on, then? Doesn't that buttress the idea that the conspiracy is going on at that point? No, Your Honor. In People v. Eddington, the Illinois Appellate Court held that a later attempt to conceal an offense is not alone sufficient to show an ongoing conspiracy. The test here is whether the primary goal of the conspiracy has been completed, and in this case it clearly had. The primary goal was to beat up— The primary goal here was they did not discuss ahead of time. There's no evidence in the record that they discussed or conspired together to conceal the offense. What they did was conspire together to beat up the victim in this case. When they left all together, fleed all together, one person was in the trunk, and they all dispersed, and then when confronted, everybody knew nothing about it. You're saying that that really wasn't any part of a conspiracy? That's correct, Your Honor. And it's telling that Lorenzo Wilson, when he decided to flee, he did so in the dark of the night. I'm sorry. He did so in the dark of the night because he didn't want his co-defendants to know, and that testimony was not— He didn't want the neighbors to see him leaving in a— Your Honor, the neighbor was the co-defendant. So he didn't— A neighbor. Well, the named neighbor in the record is—it's not clear which co-defendant, but he does say one of his co-defendants was a neighbor, and he didn't want the co-defendant to know he was leaving. One thing that I do want to maybe ask you is, you're not suggesting, are you, that the statement of a co-conspirator has to be made to another co-conspirator? No, Your Honor. I apologize if I even suggested that. So eventually, if we get to this being an error, let's assume for purposes of argument, what is your position—now, the State's suggesting you didn't raise this, but I guess the motion for the new trial would flush that out. Clearly, there was a motion raised to keep all of this out. We got that. But the State suggests this is not an error preserved. It's passed that, either under harmless error or the plain error review. What is your backup? Yes, Your Honor, this was not a harmless error. It was preserved, and it's not a harmless error. As Justice Gordon pointed out, there was an enormous amount of evidence discussed that came through the testimony of Charles Wilson or the people that testified about what Charles Wilson had said. The only people actually implicating Erica Wright, apart from all of this, our position is all of that evidence was permissibly admitted. The only people who properly testified against Erica Wright were Paris Gosha and Anthony Makin, both of whom received tremendous deals or, in Anthony Makin's case, immunity for their testimony. Did she testify? Yes. That's my point I was going to ask about is, if you took Charles Wilson out of the case, you have Paris Gosha, Anthony Makin, and Erica Wright. And the difference between what Erica Wright said, she wasn't in Passaic, New Jersey when this was going on. The question is what she knew about what the plan was and how much she signed on to. There's no question that they were at Leona's because of what she said and what she complained about and what she initially talked to them about. Yeah, and waited for. But the question is, where does she get off the bandwagon? And what does this statement or these statements by Charles Wilson really add to the dispute between her version and the Gosha-Makin versions? Your Honor, our position would be that if the state had only Anthony Makin and Paris Gosha, Erica Wright would not have testified. And so when this court looked... You can't make that argument now. That's not something we would even consider. You can't argue that she wouldn't have testified. I mean, that's not... We have the record. She did testify. And she basically said, you know, I didn't think they were going to kill him. I didn't think they were going to, you know, shoot him. I didn't think they were going to rob him. I asked them to go there to... Well, she actually denied that too. She denied that they were going there to beat him up or rough him up. The fact of the matter is, the record shows that they went there with a gun. And there's some suggestion that she knew there was a gun. So if you're going to beat somebody up, what's the point of the gun? So the jury kind of took that into account when they considered her testimony. So, I mean, her testimony has... It's here. We have to do... It has to be considered. By the way, even if you could raise it, what's the logic behind it? Because you have also the people at the restaurant who testified as to the motive for the whole confrontation. I mean, that was in front of God and everybody. That she was angry. That she got discharged. That she made threatening statements or statements of anger. And then where's the logic? Well, if Charles Wilson's statements that Lorenzo admitted to doing this didn't come in, somehow that whole rubric would change and she would not testify. Even if we were to consider it, where's the logic for that? Your Honor, defense attorneys are required to make strategic decisions all the time. And the fact is, as Ms. Donahoe pointed out, this court can minimize Charles Wilson's statements, but it was about two-thirds of the trial in Erica Ray's case. So it's true that other people testified against her. But even if this court looks at Erica Ray's and considers that testimony, she's not able to say what happened in the store. She wasn't part of it. So the only two people other than Charles Wilson talking about what happened in the store... Counsel, isn't that argument quixotic? I mean, you know, let's come right down to it. At least two of us have tried a lot of murder cases as lawyers. Isn't it a quixotic argument? How long would a reversal on our part survive with these? I think you're a sophisticated lawyer. You're doing your job very effectively. But where is the mileage in this argument? Let me just say this, Your Honor. I think your mileage is that the jury would never have found her guilty or may not have found her guilty if they hadn't heard all this testimony from the person, Mr. Wilson. If I can just close with this, Your Honors. In harmless error analysis, the state has conceded, this court is well aware, you don't only look to the sufficiency of the state's evidence. You look at the nature of the error. And in this case, this is universally accepted as one of the most prejudicial types of errors. So this court, in Bruton, the Supreme Court held that it's a particularly prejudicial error because we can't know, it's impossible to know whether a jury was able to disregard it. Here it's not impossible at all. We know the jury, in fact, did take it into account because they were instructed to do so erroneously. And because the nature of the error was very prejudicial, this court should reverse and remand. Thank you very much, Ms. Moran. Ms. Mahoney. It's a good thing we didn't set this for St. Patrick's Day, the three of you. Good morning, Janet Mahoney on behalf of the people of the state of Illinois. With regard to the omission of the audio statement and the handwritten statement as to both Wilson and Ray, this is being analyzed under a forfeiture argument. Now, Wilson in his reply brief stated that he did object on the grounds of personal knowledge at one point. However, if you look at the record when we were talking about personal knowledge, it was a discussion about 115-10.2 specifically. And it had nothing to do with an argument about 115-10.1. And it was never mentioned in conjunction with 10.1. As regards to Ray, she never objected on the grounds of lack of personal knowledge, and this is not in the motion for new trial. As to the impeachment thing also, it's forfeited also. So the analysis here is under a forfeiture. So while harmless is, you know, a term that's kind of thrown around because ultimately our There's a claim here that you have some fundamental structural constitutional issue that would preserve this argument under plain error. And it's the people's position that this does not qualify as a structural error. Well, it would if there was, I suppose, a Sixth Amendment issue involved there. At least arguably, even if there are grades of Sixth Amendment type of arguments, some that rise and some that don't quite make it to a structural error, at least the continuum here would exist under that, if not under the due process constitutional issue, which conceivably could be constructual depending on the extent of the deviation from the standards of the Fifth Amendment. I believe at this point what's been listed for structural error has been pretty limited, and this was not included in it. So it's the state's position that it is not a structural error and that you need to analyze this via the plain error. Isn't it true that in their response briefs for the reply, they both argue that they have preserved these errors via the motion for a new trial? With regard to this issue of substance abuse and impeachment of the audio tape and handwritten, I believe it is only Wilson in the reply brief who says that they preserved that issue. Erica Ray, when it comes to the co-conspirator statement, is saying in her reply brief that she preserved that issue. She did not, but that's a separate issue from what we're discussing. But in the reply brief, isn't there a discussion with Judge Fox where he specifically directs the lawyer to, are you claiming under the co-conspirator exception? Doesn't he say that? How could he be addressing it in the hearing on the motion for a new trial if it wasn't in there? I believe that they were talking at one point about 115-10.2, but overall, throughout the whole trial, they were objecting on this that it was cumulative and there were no guarantees of trustworthiness. They weren't talking about not having personal knowledge. It gets worn out, and it's our position that it has been forfeited. Even if it's not forfeited, you can call it harmless error. You can call it not closely balanced. It doesn't really matter. The evidence in this case was overwhelming, as you've already gone through at length with both counsels. They would dispute that, given the impeachability of the other two co-defendants in this particular case, the deals that they made with the prosecution before they testified, and the tenuous admissibility of any of Charles' testimony against them. The point could be made that the evidence is not that distant. It's not a frivolous argument. Anthony Macon was never charged with anything in this case. OSHA was, and he did make a deal. Anthony Macon was not charged. There is no deal there. Well, it doesn't mean there's no deal. That's the biggest deal in the world. Not even to get charged. He wasn't in there. He had the good sense to walk away. You would concede that wasn't a withdrawal under the law. He wasn't charged with murder in this case. He went there with the intent of joining in their plan to go beat up, at least, the deceased. And then he went to the front, for whatever purpose, as they went to the back. And he left. Not only left, he didn't take the best accommodations. Wasn't he the guy who was in the trunk? I think Paris was in the trunk. Well, whatever. He left with everybody else. And so, let's put it this way. You stood up there in cases with people less involved, or more involved than that, who weren't... In terms of credibility, though, he is certainly... You mean the state wouldn't have said, prove your innocence in good faith by testifying? Well, this is all speculation. Well, of course it is. But it's not any greater speculation than yours that there was no deal. There was no deal read into the record. And add into the fact that Paris and Anthony's account of what happened was... Do you want to dig in or fall on that question? Or do you have other things to discuss? Well, let's discuss other things. Let's look at it overall. What we're really talking about here is the statement that, I think I killed somebody, or I think I shot somebody, I think I killed them. That's really the crux of what's at issue here. Because all the other things were personally observed. The fleeing, the demeanor of Wilson, the co-conspirator, the gun being produced, the pieces of the gun being thrown out, certain pieces of the gun being saved, those saved pieces of the gun being found later, those saved pieces of gun matching a description from one of the witnesses, all the testimony about what happened in the restaurant prior to this event, about how she was let go, and how she was angry. There is a lot of corroborating evidence here that make Paris Gosha and Anthony Macon more credible. So the evidence in this case really was overwhelming. Call it harmless, call it not closely balanced. Either way, this conviction should be affirmed. Now, as to the personal knowledge of the admission, I believe you addressed that with co-counsel, and whether you were playing devil's advocate or not, you were asking questions that were literally the points that I was going to make. This is an admission the state was bringing in. They were not bringing him in as an eyewitness, nor did they ever pretend to say that he was an eyewitness. To anything other than what he observed in the trip to Mississippi. And the admission, right. He observed an admission. He personally observed Lorenzo Wilson make an admission, You're asking us to disregard at least four cases that have dealt with McCarter. That the personal knowledge has to extend to the events described in the admission, rather than the admission itself. As well as the underlying basis of this legislation, which was Professor Graham's statement in his treatise, or in his articles, that this was not covered by that. And whether we agree or we disagree, it would be a reversal of all of the cases in Illinois that have decided this issue, for us to accept your argument. Including an illusion in the Supreme Court's case, that it at least is not embarrassed by that holding, insofar as it used it in its dictum as a basis for its discussion. But at the end of the day, the grand jury testimony absolutely comes in. There's no case that suggests that that provision, it keeps this out. So, now that it's in, and then it's introduced via, it's repeated through the videotape and the signed statement. Correct. And just as a little reminder, as to Erica Ray, her audio tape, by the way, did not contain this statement. So as to Erica Ray, it's only in the handwritten, I think I shot somebody, I think I killed him. It's only in her handwritten. So it's not repeated twice, it's only once. It also comes in as impeachment. To say that Charles Wilson's testimony wasn't damaging, it absolutely was. At one point, throw away or not, it doesn't matter. I'm not going to talk about his confession. He absolutely said it on the stand. He was throwing everything out there. And by doing that, he's damaging the case. How is it ever not damaging, according to that perspective? Where you have a recanting witness, how will it ever not be damaging? His recantation is in itself damaged, but that's not considered damaging by the analysis that the cases have given it. Professing a lack of memory is damaging. Saying I was high, I was low. That's not how a recantation takes place. But it's damaging. That is damaging in this case. It may be damaging in the vernacular, but it's not damaging according to the analysis given under the rules of evidence. Insofar as the state is not hurt, the state that the analysis is that impeachment is preserved for those situations in which the state finds it necessary to neutralize testimony given in court. Its purpose is to neutralize, not to enhance, not to give another version, but simply to destroy the impact of the testimony that's given. And in this case, if you look at what the witness said in court, there is nothing to neutralize unless you consider neutralization the reinstatement of substantive evidence. And that's not what it is. At least that's how I explained it at one time to my evidence students. Well, in this case, the sudden lack of memory alone is damaging, and the state should be permitted to neutralize that. Ms. Mahoney, isn't the purpose of impeachment, as opposed to the substantive evidence that came in statutorily through 11510, is to say, weren't we always told, all the cases say, that it's not for proving the substance of the statement. It's only to destroy the credibility of the statement that's said on the stand. So if that is the case, the only possible statement that could be destroyed by that, neutralized by that, is his professed lack of memory. And the professed lack of memory is inconsequential because it doesn't damage the state's case. Only, what you're really arguing, is the thin end of the wedge to try to get it in as substantive evidence, and not to repair any damage done by the testimony of Mr. Charles Wilson. In addition to having a lack of memory about anything that he ever said before, he had a lack of memory as to whether the defendant was his nephew, whether he, you know, he... You have a zero on the stand, a zero witness. You can't neutralize a zero. It's already neutralized. I'm sort of missing something here, and that is that if this evidence is admissible for one purpose, I mean, is it or is it not? Was it admissible for the purpose of substantive evidence under 115? Yes. So what do we do when evidence that's admissible for one purpose is being challenged as inadmissible for some other purpose, but it's the same evidence? What's the case law out there? It's sort of an alternative argument. Hey, if you decide that these two things weren't admissible as substantive evidence, it's okay because guess what? They were also admissible to impeach him. One way or another, they came in, they got... The 115 says it's not for impeachment. It says it's substantive evidence. 115 allows the first portion, the grand jury testimony, to come in as substantive evidence. Are we talking about an error? What are we talking about? When the evidence was admissible through the grand jury provision, 115. You're right. The other two statements are not impeaching statements. They are prior consistent statements, consistent with the first statement that what became admissible under 115. That was rejected at Johnson. That was rejected. It's been rejected a number of times. One of the reasons for a rejection of that is that a witness shouldn't be allowed to get up there and only be confronted with one of these prior statements and then go on to deny all the others and suffer no consequence for it. There should be consequences for denying your prior independent statement. Who is supposed to suffer those consequences? The witness or the defendant? In terms of being able to impeach him with that, with that prior inconsistent statement, it still remains inconsistent. That's why I think the same reasoning that applies to the use of prior consistent statements when you have testimony given in court on the grounds that that is hearsay. I mean, the reason you can't use a prior consistent statement is because the prior consistent statement is hearsay. Of course, an argument, I suppose, could be made about cumulative, but that's not inherent in the theory for outlawing prior consistent statements. So this is a major break that one gets under the analysis that when those statements come in under 115, they're not covered by the interdict against the use of prior consistent statements. It means you can have a thousand statements and a thousand statements to overwhelm the jury because, obviously, repetition is, I mean, Hitler, I suppose, you know, Goebbels always said, you know, repeated often enough in any line will be belief. But so you somehow get that license through 115. Now, why? Consistency is measured against the trial testimony, not between the prior statements, and that's what all the cases say. So when these prior statements are inconsistent with the trial testimony, just because one's coming in, whether it's through 115-10.1 or not, the other ones are still inconsistent with that trial testimony. In other words, your analysis of the use of multiple prior statements under 115 hangs on the notion that it is usable for purposes of impeachment and becomes vulnerable to the extent that the argument which we just had and discussed, that there is nothing to neutralize in terms of the in-court testimony. Consequently, impeachment has no place in this equation, and the only way to get the other, all the statements admissible, is by saying that 115 is immune against the interdict for the use of prior insistence statements. Did you plan to spend most of your time discussing this issue or the fact that it's coming in anyway under the grand jury? Ultimately, it is coming in anyway under the grand jury, but it is the state's position that all three of them were admissible under 115-10.1, and that being, again, getting back to the point of it was a personal observation of an omission. But when the assistant state's attorney introduced those in the trial, he or she was doing that despite the fact that this court had said several times that in the original history of the 115-10 said that isn't personal knowledge. So they created that issue for us to all talk about. For us to all talk about, and by... And they already have the statement coming in through the grand jury. But by excluding these admissions under the personal, for not having personal knowledge of the underlying event, in some ways it's a punitive measure and not really address that, are we getting trustworthy, admissible statements. It's hard to call it punitive when one's sustained is intended as basically a shift in the common law rule to cope with the increased gang activity and crime, which led to volumes of recanting witnesses and impeded the prosecution. So it is, in effect, an attempt to help the prosecutor. Not in effect. For those of us who predate 115-10, it was a gift to the prosecutor. I imagine they just used the word gift. But there were other such gifts, such as, for example, allowing the police to testify to their hearsay confrontations to explain their investigation. But that's there. But now to call it a punishment when it's restricted is a kind of irony. Not really, because every day of the week, if this witness gets on the stand and testifies and doesn't change their testimony, everything he has to say comes in and we're not even discussing it. Now, the fact that the state either did not or could not get him to the grand jury. Assume we don't have the grand jury. Could not or did not get him to the grand jury. Well, now it doesn't come in? Because before we said it was really good evidence. And now suddenly it's not because he didn't swear under oath and he doesn't have personal knowledge of the underlying events, which then make him an eyewitness. But when they gave you that legislative opportunity, they did it with some restrictions on it. But the restriction is not written in the statute. It's not written in the statute.  But if you take a look at the legislative history, that was expressly talked about as something that the personal knowledge is not satisfied under the theory of the people who were the proponents of this legislation. It wasn't seen as satisfying that requirement. You had to have, according to those people who brought this idea to Springfield and got it passed, you had to have seen the subject matter, observed the subject matter of the statement and not just the utterance of the statement. That's what they said. Not that they didn't say of the statement. I think of the event. And in this case, the event is the omission. It is not an eyewitness. I understand. But the case law and the legislative history is clear as to what's meant. So why don't we move on? The co-conspirator statement in Erica Ray is the other issue that was addressed here. Again, this one was forfeited. In the reply brief, they stated that it was not forfeited because they stated it violated his right to confront and cross witnesses. Well, that isn't whether this is a co-conspirator statement, whether this is made in furtherance of the conspiracy. Two separate issues. So what's the conspiracy? The conspiracy is to go there, commit a crime, and then hide what you did. And so how are you hiding what you did? Let's stop the clock at the time he walks into his family home, sees his great uncle, who looks at him and says, is there something wrong? You don't look right. And he says, I think I shot someone. How is that in furtherance of the conspiracy? Because he now is seeking help. Well, where does it say that he sought help from everybody? He came in and looked not himself, and a family member made a statement asking for the nature of his discomfiture, and he then confesses to his act. How is that a conspiracy? What happens later clearly becomes a conspiracy between Charles Wilson and Lorenzo Wilson's parents and Lorenzo Wilson to help him get out of town and hide from being arrested and prosecuted for this. But where's the evidence that that conspiracy, even if you consider it as part of the underlying crime, where's the evidence that it existed at the time of that colloquy between Lorenzo and Charles? Because if he wasn't seeking help, he wouldn't have answered the question. He was looking for help. So we're going inside his home to say. No, let's go back to the restaurant. What did the witness that's not involved with any of these people say he observed in that hallway area when Corey was on leave? What did he say? What did this witness who was in the restaurant, who then goes and tells somebody that something's going on back there, what did he say? He saw three men hitting Corey, and he heard three gunshots. And he heard three gunshots. He heard three gunshots. Was that corroborated that there were three gunshots? I don't know how many gunshots there were, and I don't really think that that was an issue. He saw three men. Correct. And there was a gun in the car. Correct. And he goes to tell the other worker, Justin. And what was the plan originally, to go there and beat him up? Well, the plan was supposedly to beat him up, but they brought a gun. And the gun was displayed openly in the car, and there is evidence in the record to suggest that it was also for a robbery. They were waiting in the car for the right time for the, you know, we're going to go in the back where the cash registers are. So it was the one that was displaying the gun in the car. It was Lorenzo Wilson displaying the gun. And Anthony Macon saw it, and he described it in the description he provided, matched the pieces of the gun, found where Lorenzo Wilson left them at his Uncle Charles' house. So in terms of the conspiracy, telling somebody that you think you shot somebody is seeking their help in the situation you find yourself in. Now what do I do? Now, his uncle could have said, you know what, we're getting a lawyer and we're going over to the police station. But that's not what they did. He had gone to a lawyer's office and told the lawyer that? Would that be part of a conspiracy? Well, that's the client's attorney's business. So what? If the attorney is part of the conspiracy to conceal, then that doesn't save it. He's the attorney. It's a different relationship. He goes to a priest. Is that part of a conspiracy? Privilege we won't know. How are we reviewing the trial judge's ruling that this was a co-conspirator's statement? Well, as we know, so you're reviewing it via plain error. The trial judge say to the lawyer, are you talking about the co-conspirator exception? Didn't you say that at the motion for a new trial? I mean, you keep saying it's plain error. They say it isn't. They say they didn't waive it because they asked, the judge asked specifically, are you talking about the co-conspirator exception? So, I mean, why is the judge asking about it if it's not in the motion or if it's not before him? Let's get back to the plain error for now. We'll have to look at the motion ourselves to see what was in there. It's an evidentiary ruling. And it's an abuse of discretion. And again, getting back to the same argument I made before, you can call it harmless, or you can call it not closely balanced. There was overwhelming evidence of guilt in both cases. And in this case, we're talking about very little evidence, as you stated before. We have two of the witnesses who were part of the crime. We have the gun pieces. We have her testimony, admitting that she was there. She's there. She's part of the whole thing. Her whole argument is, gee, I just didn't know that they were going to kill him. So, therefore, I'm not guilty. So, again, the evidence in this case, harmless or not closely balanced. The convictions for both of these defendants should be affirmed. Ms. Mahoney? Thank you. Rebuttal. First, Ms. Benow. Thank you, Your Honor. Just a few points. First of all, with respect to the state's forfeiture argument, I'm not sure how much clearer counsel could have been than saying that only statements that involved Charles' personal knowledge should come in. It's true that the state started out its argument under Section 10.2, but that didn't really apply because that would be a witness who refused to testify, even though Charles wasn't cooperating. He was there on the stand testifying. And so that was how the state was proceeding. But defense counsel was very clear. That was page SS35 of the record, that he was opposed to statements that did not involve personal knowledge. And he did use the term circumstantial guarantees of trustworthiness, that is language contained in 10.2, but it also very aptly describes all of the criteria of 10.1. And post-trial, there was a post-trial motion and a discussion regarding personal knowledge, and a trial judge explicitly stated that Charles Wilson did have personal knowledge, and that was an erroneous finding in light of Carter, Morgison, Cooper, and all these other appellate court cases. And then I think we've made our position clear that Section 115-10.1 does require personal knowledge, and that means a firsthand account  With respect to impeachment, your honors noted that the purpose is to destroy the witness's credibility. In this case, Charles destroyed his own credibility. He offered almost no affirmative testimony. He did not injure the state's case. He did not damage the state's case. He just disappointed them. With respect to the state's argument that the error was harmless, we again point out all of these flaws. Gosha and Macon were clearly biased based on their involvement in the crime, whether or not there was an explicit deal on the record about Macon not being charged. He talked about his involvement in the murder, seeing a weapon, and he didn't get charged with anything. He's going about his life, as far as we know right now, unaffected by this case. Both of these witnesses lied to the police. Their stories were rife with inconsistencies, confusion. Parris thought that he'd been shot, and he jumped in the trunk of the car. Their stories were very disorganized, biased, and in light of the fact that Charles's own testimony was so problematic, we acknowledge that the grand jury testimony... Well, there is nothing weak about putting your client... Well, let's say you're representing Lorenzo, right? Yes. Your client being the shooter in this case and being on the scene. What's weak about that? Where is that weak? And being in flight. We have three flawed witnesses describing that. We have Charles Wilson, Parris Goschott, and Anthony Mason. Was Erica a flawed witness? She put your client... She put this new guy, your client, at the same... Well, her testimony wasn't admitted against my client. That's correct. And these three witnesses had serious problems, and the grand jury testimony would have come in, but Charles was such a terrible witness that if that's all the jury had, we do believe that they would have very likely disregarded it, and Parris Goschott and Anthony Mason's testimony would not have been enough. And so that's this court jury version. Thank you, Ms. Donahoe. Ms. Moran, final words? I have just one point on rebuttal. The state said at one point that Lorenzo Wilson's confession was only admitted one time against Erica Ray. It was actually admitted five times. The state questioned Charles Wilson about it at two separate occasions and then called two different assistant state's attorneys. I think what she was referring to was the fact that they only used one of the two non-grand jury statements. Is that correct? That is correct. That's all we took it for. Erica Ray's testimony was not admitted against Lorenzo Wilson, but Lorenzo's was admitted against Erica, and that's the problem here. Thank you very much, all of you, for a very well-written and argued case. We'll take it under advisement and issue a ruling in due course.